UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRIPLE PROPERTIES DETROIT, LLC,

    Plaintiff,

v.

FIRST AMERICAN TITLE INSURANCE
COMPANY,

    Defendant.

Case No. 24-cv-10986

HON. MARK A. GOLDSMITH

_____/

### OPINION & ORDER (1) GRANTING FIRST AMERICAN'S MOTION FOR SUMMARY JUDGMENT (Dkt. 27) AND (2) DENYING TRIPLE'S MOTION FOR SUMMARY JUDGMENT (Dkt. 29)

Plaintiff Triple Properties Detroit, LLC filed this breach of contract action against its insurer, Defendant First American Title Insurance Company. Triple owned 14 undeveloped units in a condominium development and purchased a title insurance policy for the units from First American. See Am. Compl. at ¶¶ 6, 7 (Dkt. 5). Triple later conveyed the units to PCJ Investments, LLC. See id. at ¶ 10. Two years later, PCJ received notice from the condominium association that Triple did not hold title to the units when it had conveyed them to PCJ. See id. at ¶ 11. PCJ then brought suit against Triple, alleging breach of contract, fraud, and misrepresentation based on Triple's failure to disclose that it did not own the units, and First American denied Triple's request for defense, affording no coverage to Triple properties. Id. Triple now brings this suit against First American, asserting that it breached the insurance contract by refusing to provide a defense in the lawsuit or indemnity. Id. at 6–25.

1

The parties now move for summary judgment on this breach of contract claim. First American argues that it is entitled to summary judgment because (i) Triple's claims are specifically excluded from policy coverage, (ii) Triple received fee simple title in 2011, which was the characterization of the insured title in the policy, and (iii) Triple's claim is barred by the statute of limitations. Def. Mot. 12–24 (Dkt. 27). Triple argues that it is entitled to summary judgment because First American breached its duty to defend in that (i) the policy exclusions do not apply, and (ii) Triple did not receive fee simple title in 2011. Pl. Br. Support Mot. 4–22 (Dkt. 30).

For the reasons that follow, the Court (i) grants First American's motions for summary judgment (Dkt. 27) and (ii) denies Triple's motion for summary judgment (Dkt. 29).[1]

## I. BACKGROUND

This action concerns 14 units in Richard Rowhouses Condominium, located in the City of Detroit. Construction of the Condominium's infrastructure commenced in early 2004 under the initial developer, Westminster Abbey Homes, LLC. See Notice of Commencement at PageID.1049 (Dkt. 30-8). A mortgage foreclosure ensued, resulting in Bank of America, N.A., acquiring title to the 14 units at a sheriff's sale on October 14, 2009. Sheriff Deed at PageID.1052–1057 (Dkt. 30-9). A little over two years later, the bank conveyed the units to Triple Properties. See Covenant Deed at PageID.1032–1034 (Dkt. 30-4). Some ten years later, on December 3, 2019, Triple Properties sold the units to PCJ Investments, LLC. See Warranty Deed at PageID.1059–1061 (Dkt. 30-10).

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the pending motions, briefing includes: (i) as to First American's motion: Triple's response (Dkt. 35) and First American's reply (Dkt. 38) and (ii) as to Triple's motion: First American's response (Dkt. 33) and Triple's reply (Dkt. 39).

2

In connection with its purchase of the units, Triple Properties acquired an owner's policy of title insurance issued by First American on November 24, 2011. See Covenant Deed at PageID.1032–1034; Policy at PageID.1036 (Dkt.30-5). Subject to conditions and exclusions, the policy insured against loss or damage sustained or incurred by reason of title being vested other than as fee simple, or by reason of any defect in, or lien or encumbrance on, the title, or because title was unmarketable. Policy at PageID.1039. First American further agreed it would pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by the policy. Id. at PageID.1039, 1040.

The master deed contained a provision stating that if, after a 10-year period following commencement of construction, the developer does not withdraw from the project undeveloped portions of the project, then the undeveloped property becomes part of the general common elements, and the developer loses all rights to construct units on that property.[2] Master Deed at PageID.1047 (Dkt. 30-7).

Based on this provision, the Richard Rowhouse Condominium Association notified PCJ, by letter dated April 13, 2021, that it was asserting that title to the units had vested in the co-owners

---

[2] The language of the provision—which was virtually identical to the language used in Mich. Comp. Laws § 559.167(3) prior to its amendment on September 21, 2016—stated:

> [I]f the Developer has not completed development and construction of units … in the condominium project that are identified as "need not be built" during a period ending 10 years after the date of commencement of construction by the developer of the project, the developer, its successors, or assigns have the right to withdraw from the project all undeveloped portions of the project not identified as "must be built" without the prior consent of any co-owners, mortgagees of units in the project, or any other party having an interest in the project. ... If the developer does not withdraw the undeveloped portions of the project from the project before expiration of the time periods, those undeveloped lands shall remain part of the Project as general common elements and all rights to construct units upon that land shall cease.

3

of the Condominium as general common elements. 4/13/21 Letter at PageID.1063–1066 (Dkt. 30-11). PCJ commenced an action against Triple Properties and Richard Rowhouses in Michigan's Wayne County Circuit Court on August 10, 2021, Wayne Cty. Compl. at. PageID.1068–1083 (Dkt. 30-12), and Triple Properties notified First American of the action on August 20, 2021. Notice at PageID.1085–1086 (Dkt.30-13).

> First American denied coverage on September 8, 2021, asserting that the claim was:
>
> excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
> 3. Defects, liens, encumbrances, adverse claims, or other matters
> (a) created, suffered, assumed, or agreed to by the Insured Claimant;
> (d) attaching or created subsequent to Date of Policy.

Claim Denial at PageID.1090 (Dkt. 30-14). As a result of First American's refusal to provide a defense, Triple Properties retained a law firm to defend it. See Cross Compl. at PageID.1092 (Dkt. 30-15). The Wayne Circuit Court ultimately ruled that title to the units was vested in the co-owners of the condominium. Op. at PageID.1094–1118 (Dkt.30-16). That litigation continues, as Triple Properties has filed a claim of appeal. See App. at PageID.1120 (Dkt. 30-17).

## II.    ANALYSIS[3]

Triple argues that First American had a duty to defend PCJ's suit against it and breached that duty by refusing to do so. Pl. Mot. at 4–22. First American argues that it had no duty to

---

[3] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1985).

defend or indemnify because of specific policy exclusions. Def. Mot. at 12–22. The Court now considers whether the claim falls within one of the specific policy exclusions, Exclusion 3a.[4]

Under Michigan law, "an insurer's duty to defend is broader than its duty to indemnify." Radenbaugh v. Farm Bureau Gen. Ins. Co. of Mich., 610 N.W. 2d 272, 275 (Mich. 2000) (quoting Auto-Owners Ins. Co. v. City of Clare, 521 N.W. 2d 480 (Mich. 1994)). "The duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured." Detroit Edison Co. v. Mich. Mut. Ins. Co., 301 N.W.2d 832, 835 (Mich. 1980). "[I]f the allegations of the underlying suit arguably fall within the coverage of the policy, the insurer has a duty to defend its insured." Radenbaugh, 610 N.W.2d at 275. "The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegation to analyze whether coverage is possible." Detroit Edison Co., 301 N.W.2d at 835. The insurer owes "a duty to defend until the claims against the policyholder are confined to those theories outside the scope of coverage under the policy." Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co., 550 N.W.2d 475, 483 (Mich. 1996). However, "an insurer is not required to defend its insured against claims specifically excluded from policy coverage." Am. Bumper & Mfg. Co. v. Nat'l Union Fire Ins. Co., 683 N.W.2d 161, 165 (Mich. 2004) (punctuation modified).

First American invokes Exclusion 3(a), Def. Mot. at 12–22, which provides:

The following matters are expressly excluded from the coverage of this Policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

3. Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

---

[4] Because at least one of the exclusions bars coverage, there is no need to consider First American's alternative arguments.

5

SOF at ¶ 21 (Dkt. 28); Policy at PageID.1040, Exclusions from Coverage at ¶ 3(a).

First American asserts that pursuant to the terms of the master deed and the Condominium Act, Triple had 10 years from commencement of construction to complete the development and construction of the entire project, or to withdraw from the project all undeveloped portions of the project. SOF at ¶¶ 27–30. If the developer does not complete a unit, or withdraw it from the project, within the 10-year timeframe, the unit becomes part of the general common elements, and the right to build units on that land ceases. Id. at ¶31; see Dep. Tr. Simon at 34 (Dkt. 28-4) (discussing master deed, Article VII, § 6 (Expiration of Rights). The Court must determine whether, at the time PCJ initiated its lawsuit against Triple, whether Exclusion 3(a) applies, i.e. whether Triple developed or withdrew the units within the 10-year timeframe. See Am. Bumper, 550 N.W.2d at 483.

Triple's manager, Alex Loewy, admits that it could have constructed the undeveloped units. See Dep. Tr. Loewy at 43 (Dkt. 28-7).[5] Triple's owner, Stavros Apostolopoulos, stated that Triple considered constructing the undeveloped units, but it was a business decision not to do so. See Apostolopoulos Dep. Tr. at 38–42, 69–70, (Dkt. 28-5).[6] Similarly, Triple could have withdrawn the undeveloped units from the project. Id. at 35.[7] But Triple did not withdraw the undeveloped

---

[5] Q: Okay. And could Triple have also built these 14 units at the—at the time it first took title, which again is November of 2021—or 2011, when it took title, could Triple have built the remaining 14 units? A: I believe so. Loewy Dep. at 43.

[6] Q: Did you have any discussion with your dad [Andreas Apostolopoulos, Triple's owner until February 2021] about what Triple Properties should do with the property, again, now this is 2011 to 2014? A: The general consensus was that we were going to hold the property and develop it when the market was right, or sell it to a builder when the values started going up. Apostolopoulos Dep. at 69–70.

[7] Q: Do you understand that to mean that the developer, as long as he's within the ten-year period, has the right to withdraw some of the land from the project? A: Correct. Yep. Id. at 35.

6

units.[8] Id. at 69. Triple acknowledges that if it had timely undertaken the construction of the undeveloped units or withdrawn the undeveloped units from the project, it would not have a title claim. See Loewy 2 Dep. Tr. at. 159 (Dkt. 27-8). Thus, First American argues that Triple "assumed" or at least "agreed to" the reversion, excluding it from coverage under 3(a) of the policy. Def. Mot at 14–18.

The Court agrees that the exclusion bars coverage. The loss of title was the direct result of Triple's deliberate acts. It knowingly failed to complete construction of the 14 units within the relevant 10-year period. And it failed to withdraw them from the project, as well. Its conduct falls comfortably within the plain and natural understanding of having "created," "suffered," "assumed," or "agreed" to the defects of title.

A Sixth Circuit decision interpreting this very language confirms the conclusion. In Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp., 793 F.2d 780, 784 (6th Cir. 1986), where a construction lender brought suit against its insurer for breach of a title insurance policy for refusing to cover losses resulting from underfunding a housing complex construction project:

> The term "created" has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence or negligence.
>
> Similarly, the term "suffered" has been interpreted to mean consent with the intent that "what is done is to be done," and has been deemed synonymous with "permit," which implies the power to prohibit or prevent the claim from arising. . .
>
> "Assume," under this definition requires knowledge of the specific title defect assumed.

---

[8] Q: And [Triple] did not withdraw the units from the condominium project, correct? A: Not that I'm aware of. Lowey Dep at 72.

Q: Okay. That's fine. Alex, can you tell me why Triple Properties didn't withdraw these units from the project in 2011 or 2012, 2013 or early 2014, why it chose not to withdraw them? A: From my understanding, we weren't aware we had to. Id. at 193.

7

> And "agreed to" carries connotations of "contracted," requiring full knowledge by the insured of the extent and amount of the claim against the insured's title. As with the other terms, this definition implies some degree of intent. . .
>
> The cases discussing the applicability of the "created or suffered" exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss.

793 F.2d at 784 (punctuation modified).

The Sixth Circuit interpretation applies here. Triple had the "power to prohibit or prevent the claim." And, at a minimum, it "impliedly assumed or agreed to the defects." Exclusion 3a applies fully and defeats any claim for coverage.

Triple raises several arguments, but none is availing.

Triple argues that the "created or suffered" exclusion requires that there must be something amounting to "intentional misconduct" or "inequitable dealings." Pls. Resp. at 13. However, this assertion is contradicted by the language above from Am. Sav. & Loan Ass'n, which states that while the creation of title defects may be based on intentional misconduct or inequitable dealings, defects may also be created if "the insured either expressly or impliedly assumed or agreed to the defects or encumbrances…." Id. at 784.

Here, there is no question that Triple acted with full knowledge that its conduct would bring about a loss of ownership rights. Triple retained an attorney to review the closing documents; it evaluated the market conditions to conclude that it would not build the undeveloped units; it voted "no" to amend the master deed that would have allowed another developer to become the successor developer; it declined to tell First American that the association claimed title to the undeveloped units in 2016; and it declined to tell PCJ the same thing before it proceeded to sell the undeveloped

8

units to PCJ. Simon Dep. at 15; Apostolopoulos Dep. at 41, 47–48, 68–73, 120–121; Loewy Dep. at 89, 92, 138–140, 191.

Triple also disputes that it could have withdrawn the units from the project because while it was a "successor developer," it was not the direct successor or assign of the original developer, Westminster Abbey Homes. Pl. Mot. at 10–11. However, this argument is flawed for several reasons. For one thing, as First American points out, Triple could have built the units, instead of withdrawing them, making its status as successor or assign irrelevant. Def. Resp. at 19. For another, it was a successor or assign, as the conveyance documents attest.[9] Nothing in the law requires a later developer to be the immediate successor or assign of the original developer in order to exercise the right of withdrawing units from a project.[10] Further, the Michigan Court of Appeals has held, in a case interpreting the same statute at issue here, a later developer's status as a successor is irrelevant because the ownership rights expire simply as a result of a failure to withdraw or build the units within the timeframe specified in the statute. Elizabeth Trace Condo. Ass'n v. Am. Glob. Enters., Inc., 986 N.W.2d 412, 418 (Mich. App. 2022) (finding that purchaser from original developer lost ownership rights in the unbuilt units of the project, regardless of purchaser's status as successor, reasoning that "[b]ecause the Unbuilt Units were not withdrawn

---

[9] The sheriff's deed expressly stated that the developer rights were sold. Sheriff's Deed at PageID.1052 (describing land conveyed as including "all of [Bank's] rights and powers as developer of Richard Rowhouses, according to the above-recited Master Deed…"). The same is found in the affidavit of purchaser. Id. at PageID.1056. In turn, Bank of America expressly assigned its rights as developer when it sold the units to Triple. Assignment of Developer Rights at PageID.725 (Dkt 28-14) ("Assignor hereby assigns to Assignee all of Assignor's right, title and interest to the Developer Rights in and to the Condominium, under the Master Deed, acquired by Assignor pursuant to the Sheriff's Deed.").

[10] Triple argues that there must be a "continuity of enterprise" for it be considered a successor, citing Foster v. Cone-Blanchard Mach. Co., 597 N.W.2d 506 (Mich. 1999). But that case talks about successor in the context of liability for defective products. That has nothing to do with the present context, i.e., a later developer's right to withdraw units from a condominium project.

from the project within the applicable time period, any rights to develop them ceased"). Triple's successor arguments are without validity.

Triple also asserts that it could not withdraw the units because "there were no undeveloped portions of the project as the infrastructure and foundations for the Units on the Land were already in place." Pl. Resp. at 13–14. However, in the state court proceedings, the Wayne County Circuit Court found that "the units reverted to the Rowhouses Association in 2014 for the reason that development on the units was not completed within 10 years." PCJ Invs., LLC v. Richard Rowhouse, Ass'n, no. 21-009946-CB at *2 (Wayne Cty. Cir. Ct. 2023). The Wayne County Circuit Court's ruling is consistent with the record before this Court.[11] And it is consistent with the language of the master deed, which required construction to be completed, not simply started. See Master Deed at PageID.1047 ("If the developer has not completed the development and construction of the entire Project…"). Completion of construction—not simply starting construction—is what is required under the statute to avoid reversion. The Trace opinion makes this very point:

> Defendant essentially contends that construction of general common elements supporting the units equates to commencement of construction of the units themselves, such that the units were not "undeveloped," could no longer be withdrawn from the project, and the rights to develop them could not have ceased. We disagree. The record shows only that construction had begun, to some extent, on roads, sidewalks, water systems, and other general common elements within the

---

[11] Q: Did your dad do anything between 2011 and 2014 with regard to constructing these buildings? A: I'm sure there was some market studies and cost to identify what it would cost to build. But, again, we're more developers, so we would get it in position to sell, and we would sell it to a builder. Apostolopoulos Dep. at 70.

Q: And building 3, which has six units labeled as 13 through 18, it's my understanding that those buildings or those units have not been built, correct? A: From my understanding, there's the utility poles there and then, yeah, it's a grassy area. Q: And building 4, which has eight units, which are 19 through 26, that those units also, at least above ground, have not been built, correct? A: There has been some work above ground, there's foundations and rough plumbing and driveways. Loewy Dep. at 31.

> project. MCL 559.167(3) contemplates that construction and improvements on "need not be built" units be <u>completed</u> within 10 years, absent withdrawal of those units during that time. Defendant's interpretation would allow developers to indefinitely avoid the statutory time frame simply by starting construction of a single general common element, like a road. This would render MCL 559.167(3) nugatory and meaningless.

<u>Elizabeth Trace Condo. Ass'n.</u>, 986 N.W.2d at 419. Accordingly, the Court rejects Triple's argument that it could not withdraw the units.

Triple further argues that the exclusion should not apply because First American failed to properly describe the state of title that it was insuring. Pl. Mot at 4–7. Triple argues it never had fee simple title because of the reversion potential contained in the master deed. <u>Id.</u> Because, according to Triple, title should have been described as fee simple subject to a subsequent condition, First American's mis-description of title breached the policy. <u>Id.</u>

But Triple fails to explain under what legal principle the exclusion would be disallowed based on a mis-description of proper title. Even if the state of title was inaccurate, Triple's loss was the result of the reversion it ended up triggering. First American never agreed to insure that risk, and Triple has supplied no authority that says an insurer must insure for an excluded risk where it has inaccurately described the state of title.

While courts in our jurisdiction have not contemplated a case like this where a developer owned condo units and failed to develop them within 10 years leading to reversion to the condo association, the United States District Court for the District of Rhode Island has in <u>IDC Props., Inc. v. Chicago Title Ins. Co.</u>, 540 F. Supp. 3d 220 (D. R.I. 2021). In that case, the insured owner of interests in a condominium development brought an action against the title insurer, asserting breach of contract, breach of the duty of good faith and fair dealing, and other claims stemming from the denial of an insurance claim for loss of title to the property, which the insured had failed to develop after which its rights expired. <u>Id.</u> at 223–224. The district court granted summary

11

judgment for the title insurer, finding that "even if the failure to effectively convert the Reserved Area into a Master Unit was a title defect . . . there is no coverage because the loss was caused by a defect . . . the insured, created and therefore Policy exclusion 3(a) applies. Id. at 227 n.9 (punctuation modified).

On appeal, the United States Court of Appeals for the First Circuit affirmed the district court's decision, holding that the insured's loss of title to an additional unit was the result of the insured's failure to exercise its reserved development rights correctly before the rights expired ("and there is no insurance against that"). IDC Props., Inc. v. Chicago Title Ins. Co., 42 F. 4th 1, 8–10 (1st Cir. 2022).

Likewise, here, Triple failed to exercise its development rights. See 3/16/2016 Letter at PageID.780 (Dkt. 28-19). And that failure occurred when Triple had full awareness of its rights and was in control of the project, so Exclusion 3a applies and bars coverage.[12] See Apostolopoulos Dep. at 40–41, 68; Loewy Dep. at 72.

Triple argues that even if the allegations against the insured "even arguably come within the policy coverage," Am. Bumper, 550 N.W. 2d at 481, it is "the duty of the insurer to undertake the defense until it [can] confine the claim to a recovery the policy did not cover" even if the claim is groundless or frivolous. Polkow v. Citizens Ins. Co. of Am., 476 N.W. 2d 382, 384 (Mich. 1991). Unlike here, in both Am. Bumper and Polkow there were factual issues that had to be developed to determine whether the claims were included in the policy coverage. In both cases whether the

---

[12] Triple's reliance on a decision from the Oakland County Circuit Court, American Global Enterprises, Inc. v. Stewart Title Guaranty Co., No. 22-197239-CB (Oakland Cty. Cir. Ct. 2024) (Dkt. 30-2) is misplaced. In that title insurance dispute, brought by an insured whose undeveloped units reverted in a manner similar to the reversion at issue here, the insurer raised a different exclusion—3(d), which bars coverage for matters attaching after the policy date—rather than the 3(a) exclusion, upon which First American relies here.

policies were triggered hinged on whether there was environmental pollution, an issue that necessitated intensive factual investigation and development. See Am. Bumper 550 N.W. 2d at 482 (citing Polkow, 476 N.W. 2d at 382). Here, no factual investigation or development is necessary to determine that the exclusion applies and that that there is no coverage. That absence of coverage, in these circumstances, includes no duty to defend as there is "no duty to defend where [there is] no coverage." Ginger v. Am. Title Ins. Co., 185 N.W.2d 54, 56 (Mich. App. 1970) (punctuation modified). The insurer is not required to defend the insured against claims expressly excluded from coverage in the policy. Id.

Accordingly, First American had no duty to defend Triple because the claims were explicitly excluded by Exclusion 3(a) of the policy.[13]

### III. CONCLUSION

For the reasons explained above, the Court (i) grants First American's motion for summary judgment (Dkt. 27) and (ii) denies Triple's motion for summary judgment (Dkt. 29).

**SO ORDERED.**

Dated: September 29, 2025  s/Mark A. Goldsmith
Detroit, Michigan  MARK A. GOLDSMITH
 United States District Judge

---

[13] Because the claims were explicitly excluded by 3(a) the Court need not discuss First American's the arguments regarding Exclusion 3(d), exemptions from coverage listed on Schedule B of the policy, whether Triple received fee simple title, or whether Triple's claim is barred by statute of limitations.

**CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 29, 2025.

                                              s/Joseph Heacox
                                              JOSEPH HEACOX
                                              Case Manager